**Lisa WAGNER, an individual,
Plaintiff-Appellant,**

**v.**

**LEE COUNTY, Florida Board of County Commissioners, Glen Salyer, an individual, James Moore, an individual, Christine Brady, an individual, Jennifer Berg, an individual, Defendants-Appellees.**

**No. 16-10576**

United States Court of Appeals,
Eleventh Circuit.

(February 2, 2017)

914

Benjamin Harris Yormak, Yormak Employment & Disability Law, Bonita Springs, FL, for Plaintiff-Appellant

Lauren Gina Brunswick, John Kressfield Shubin, Salvatore Hazard Fasulo, Shubin & Bass, PA, Miami, FL, John S. Turner, Lee County Attorney's Office, Fort Myers, FL, for Defendant-Appellee Lee County, Florida Board of County Commissioners

Lauren Gina Brunswick, John Kressfield Shubin, Shubin & Bass, PA, Miami, FL, John S. Turner, Lee County Attorney's Office, Fort Myers, FL, for Defendants-Appellees Glen Salyer, James Moore, Christine Brady, Jennifer Berg

Before HULL and MARTIN, Circuit Judges, and RESTANI,* Judge.

HULL, Circuit Judge:

Plaintiff Lisa Wagner appeals from the district court's orders granting defendants' motions to dismiss and for summary judgment. After review of the briefs and record and with the benefit of oral argument, we reverse in part, affirm in part, and remand.

## I. BACKGROUND

This appeal arises from an employment dispute. We first outline the relevant facts and procedural history.

### A. Wagner's Employment

From January 2012 to October 2013, Defendant Lee County, Florida Board of County Commissioners (the "County") employed Wagner in its Economic Development Office (the "EDO"). The EDO is responsible for promoting, coordinating, and monitoring economic development in the County. At the EDO, Wagner worked as an Administrative Specialist, which is a salaried position for which she was paid $1,269.23 on a biweekly basis. Susan Noe, the EDO's Manager of Business Assistance, hired Wagner and acted as Wag-

* Honorable Jane A. Restani, Judge for the United States Court of International Trade, sitting    by designation.

ner's direct supervisor. In addition to Wagner, the EDO employed two other Administrative Specialists and one Administrative Assistant. Performance reviews from 2012 and 2013 indicated that Wagner's work exceeded expectations.

In her role as Administrative Specialist, Wagner performed tasks similar to those typically performed by a secretary.[1] For example, Wagner was responsible for attending meetings with County officials and investors, recording the meetings, typing minutes for the meetings, and submitting the minutes for review. Wagner's other tasks included booking travel, maintaining files, assisting with website updates, and working as a front desk receptionist.

Wagner also managed and maintained the EDO's real estate database, which served as a resource for businesses considering relocating to Lee County. Wagner used this real estate database to perform property searches and find suitable commercial real estate sites, and the EDO then used this information to prepare proposals for companies relocating to the County. A work plan for Wagner covering the 2012-13 fiscal year indicated that, with respect to the real estate database, Wagner was responsible for training other administrative staff and brokers on the maintenance and use of the database, creating maps as needed for other EDO employees, coordinating with the County's software developer regarding necessary improvements, and coordinating with Florida Power and Light to resolve issues that might arise from use of the database.

## B. Wagner's Overtime Hours

The job posting for Wagner's Administrative Specialist position listed her working hours as 8:00 am to 5:00 pm Monday through Friday, but the posting also noted that these hours could vary based on work needs. Wagner stated that she worked more than forty hours a week on a regular basis—at least two or three hours per week, but sometimes more. Noe confirmed that Wagner worked "a tremendous amount of overtime on a regular basis—at least two (2) to three (3) hours every week, but many times more than that as the amount of overtime depended upon the project or assignment, such as after-hours meetings, which were regular and frequent." Noe stated, for example, that Wagner often typed meeting minutes at home after regular work hours.

Several EDO employees testified that the County records did not accurately reflect Wagner's overtime work. Noe also stated that the County did not keep track of any overtime worked by salaried employees. Both Eileen Schuman, who worked as the EDO's Office Manager and Fiscal Officer, and John Brock, who worked as the EDO's Research Analyst, stated that the County did not keep accurate records of overtime hours Wagner worked. Schuman and Brock also confirmed that Wagner worked more than forty hours many weeks.

Throughout the period of her employment at the EDO, the County classified Wagner as exempt from the overtime wages requirements of the Fair Labor Standards Act ("FLSA"). The County's employment records indicate that Wagner did not work any overtime hours during her employment. Glen Salyer, who served as the EDO's Interim Director from Sep-

---

1. The parties presented conflicting evidence about the extent and nature of Wagner's work responsibilities. Wagner and Noe stated that Wagner had no independent decision making authority or discretion and merely performed ministerial tasks. According to Glen Salyer, however, who was the EDO's Interim Director from September 2013 to January 2014, Wagner's position "relied heavily on discretion and independent judgment."

tember 2013 to January 2014, also said that Wagner did not work more than forty hours during any week in September or October 2013. Salyer did acknowledge, however, that he was aware of Wagner staying at work past 5:00 pm on one occasion. Stephanie Figueroa, who worked as EDO's Manager of Human Resources during the months of September and October 2013, stated that she was unaware of Wagner ever asking or complaining about her FLSA exempt status during the time Wagner was employed at the EDO.

## C. EDO Audit

While working at the EDO, Wagner noticed what she perceived to be potential illegal activity on the part of other EDO employees. For example, Wagner noticed that the EDO was paying vendors for items that the County did not receive and paying contractors for work that was not performed. Wagner reported these issues to Noe.

In 2013, the Lee County Clerk of Courts' Internal Audit Department (the "Internal Audit Department" or the "auditors"), which is an independent organization unaffiliated with the EDO or County management, initiated an audit of the EDO. James Moore, who was the EDO's Director at the time, asked Noe to oversee the audit and to respond to the Internal Audit Department's questions. Moore also asked Noe to "monitor" which EDO employees provided information to auditors. According to Noe, there were five EDO employees, including Wagner, who participated in the audit.

Noe stated that at some point during the audit, "the auditors asked [Noe] to set up an appointment for [Wagner] to meet with [the auditors]." Noe further said that she "directed [ ] Wagner to the auditors" and that "Wagner both spoke to [the auditors] and provided a written statement." In her deposition, Wagner was asked whether she "[was] told that [she was] to participate anonymously in the audit," and Wagner replied: "I asked to and I now know that [was not] done, but I did ask. I did state that I was in fear of retaliation ... and I did ask to remain anonymous." In her deposition, Noe also stated that she thought Wagner participated in the audit anonymously. In the operative amended complaint, Wagner alleged that her participation in the audit was voluntary.

During her meeting with the Internal Audit Department, Wagner disclosed that she was asked by EDO employees to change official records, that some records were "stolen from [her] desk," that EDO employees were "throwing out materials that [the EDO] had paid thousands of dollars for," that Wagner was asked to hide certain materials, and that the EDO was "spending money on things that just plain old [were not] done."

On April 8, 2013, Wagner signed a document setting out a number of her complaints regarding potential misconduct of EDO employees. Wagner's written complaint stated that her minute-taking recorder, which she used to take official audio recordings of EDO meetings, was removed from her desk without her permission. Wagner's written complaint also explained that the recorder reappeared on her desk three weeks later, but that the meeting minutes had been deleted from the recorder. Wagner's written complaint further noted how several EDO-related records, some of which were confidential, were removed from her desk without her permission.

As the County notes, Wagner's written complaint is not addressed to anyone and thus it is unclear from the face of Wagner's written complaint whether Wagner ever submitted it to the Internal Audit

Department or anyone else. Noe did state, however, that Wagner provided a written complaint to the Internal Audit Department during the course of the audit. There is also some evidence indicating that Wagner's written complaint was found in the audit file.

### D. The Internal Audit Department Report

In August 2013, the Internal Audit Department released a report of its findings (the "report"). Noe described this report as critical of the EDO.

For example, the report noted irregular activities within the Lee County Industrial Development Authority (the "IDA"). Like the EDO, the IDA is a County entity that works to enhance the County's economic development. The EDO provides office space and employees to the IDA. In 2010, the IDA approved a loan in the amount of $75,000 to a business owned by the spouse of Jennifer Berg, who worked as the EDO's Marketing Manager. The report also stated that County marketing business was routed to Berg's husband's company. These transactions, according to the Internal Audit Department, were in violation of Florida law regarding ethics and conflicts of interest.

In addition, the report indicated that the IDA disbursed approximately $1,500,000 in County funds to a marketing firm, but that the marketing firm's invoices did not sufficiently itemize costs for the charges billed. The Internal Audit Department was unable to find records of competitive bids associated with this marketing contract. The report also noted that two EDO projects failed to garner their expected job-development goals.

With respect to Wagner's allegations regarding removal of records, the report noted that "[r]ecords were removed from the desk of the employee who takes minutes of the IDA meetings," that "[w]eeks later, the records were returned with several minutes deleted," and that "[o]ther confidential records were also removed from the employee's desk."

Further, the Internal Audit Department's confidential interviews with EDO employees revealed morale issues within the EDO. The report did not identify by name which EDO employees participated in the audit, but it did indicate that six employees had participated and that one of them was the employee responsible for taking meeting minutes.[2]

### E. Moore's Response to the Report

On July 19, 2013, Moore received a preliminary copy of the report, which was previously leaked to the media. After receiving the report, Moore called a meeting of the EDO staff and confronted them about their participation in the audit. According to Wagner, during that meeting, Moore asked Wagner whether she participated in the audit, and Wagner responded that she did. Noe stated, however, that when Moore asked during this meeting who participated in the audit, no one responded.

On July 23, 2013, Moore submitted to Roger Desjarlais, the County Manager, a memorandum regarding EDO budget reduction options for 2013-14.[3] The memo-

---

2. The report, which indicates that six employees participated in the audit, conflicts with the testimony of Noe, who stated that five employees participated.

3. The County contends that this memorandum should not be considered on appeal because it was not discussed in the briefing on the motions for summary judgment. But the County itself introduced this memorandum into the summary judgment record as an attachment to its own motion for summary judgment. Wagner also discussed this memo-

randum laid out a budget reduction goal for the 2013-14 fiscal year and indicated that, for the EDO to meet its reduction goal, it would have to reduce its number of staff. Moore suggested eliminating the following EDO staff positions: Economic Research Analyst, Administrative Assistant, Business Development Supervisor, Fiscal Officer, and Administrative Specialist. According to Noe, this staff reduction proposal would have resulted in the termination of four of the EDO employees who participated in the audit.

On July 26, 2013, the IDA held a meeting during which its members discussed the audit. The minutes indicate that Wagner, Noe, Salyer, and Moore were among those present for this meeting. The record contains both an audio recording of this meeting and a transcript of the recording. When the topic of the audit arose during this IDA meeting, someone made a comment or asked a question regarding whether any EDO employees would be fired as a result of the audit.[4]

On August 5, 2013, Moore sent a response to the Internal Audit Department regarding the report. Moore's response addressed each of the findings in the report.

**F. EDO Reorganization and Wagner's Termination**

On September 1, 2013, Moore retired from his position as the EDO's Director. On September 3, 2013, Salyer took over as the EDO's Interim Director. Around the

time that he took over as Interim Director, Salyer met with Moore to discuss "transitional matters." When Moore and Salyer spoke about the audit, it was clear to Salyer that Moore was unhappy about it.

The County asked Salyer to reorganize the EDO, taking into consideration things like "workload assessment . . . what the core functions of the office were, what level of service [the EDO would] provide, [and] budgetary restraints." Members of the County's Human Resources staff, including Figueroa, helped Salyer with this reorganization. Salyer had the ultimate authority to terminate EDO employees.

On October 30, 2013, Salyer terminated Wagner from her employment with the EDO. Salyer purportedly based this decision on several factors. Wagner was one of three Administrative Specialists employed by the EDO and one of four total administrative staff in the EDO. Salyer felt that there was insufficient workload to justify the employment of this many administrative personnel. Of the administrative employees working in the EDO, Wagner was the second-most junior, and Salyer also terminated the most junior administrative employee. In addition, the EDO was no longer using the real estate database on which Wagner worked. Wagner's position has not been refilled since her termination; her duties have been eliminated or reassigned.

randum in her surreply to the County's motion for summary judgment. Because this evidence appears to be properly included in the record, we see no reason not to consider it here.

4. The parties submitted contradictory evidence regarding what was said during this meeting and by whom. The transcript indicates that during the meeting, in reference to the audit, Moore stated: "There are legs on this." The transcript then indicates that, when

asked by an unidentified individual whether this meant that "[s]omebody [was] going to get fired," Moore responded: "No." But according to Noe, who was present at the meeting and also reviewed the audio tape, it was Moore who stated during this meeting that someone would get fired as a result of the audit. Schuman and Brock also reviewed the audio tape and reached the same conclusion as Noe.

According to Salyer, Wagner's termination was part of a larger effort to reduce EDO expenditures. Salyer noted that in 2013, the County faced a multi-million dollar revenue deficit, and the County management directed the EDO to reduce its spending. In connection with that budget reduction effort, in addition to terminating Wagner, Salyer terminated three other EDO employees who had participated in the audit.[5] These were the same employees that Moore had recommended terminating in his July 23, 2013 memorandum to the Desjarlais. Salyer did not terminate any other EDO employees.

Noe stated, however, that there were no major budgetary issues at the time of these terminations. According to Noe, the County had asked the EDO to reduce its spending by only $70,000 and the EDO could have achieved that $70,000 reduction by eliminating one EDO position. In fact, Noe stated that the EDO's budget for the 2012-13 and 2013-14 fiscal years was already approved by County management prior to Wagner's termination and that the EDO's funding actually increased from the 2012-13 fiscal year to the 2013-14 fiscal year. County budget records confirm that the "Economic Development" budget increased from $1,220,913 in the 2012-13 fiscal year to $1,329,191 in the 2013-14 fiscal year. Noe believed that there was no budgetary reason to terminate Wagner.

When asked whether he took the audit into account in making termination decisions, Salyer stated that he did, but only to the extent that the report indicated that the EDO failed to properly document certain payments it made. Salyer later stated, however, that all of the audit findings were "of interest" to him. Salyer also said, in relation to the audit, that he was aware of morale issues within the EDO—that there was "backstabbing and infighting" among employees and that employees seemed "demoralized" by the audit outcome. In an effort to deal with the EDO's morale issues, Salyer and his team endeavored to bring the EDO employees together as a more cooperative and cohesive group. Salyer felt that Wagner and Noe were not ready, willing, or able to be productive team members.

Salyer maintains that he was unaware who participated in the audit or what statements EDO employees made to the Internal Audit Department. Salyer indicated that he "assumed that [all EDO employees] had participated in the audit," but that "this assumption was not based on fact." Noe asserted that Salyer could have determined from the audit report itself that Wagner was a participant—the report identified the employee responsible for taking meeting minutes as an audit participant and Wagner was the only employee responsible for taking such minutes. Noe further stated that Salyer had a "close relationship" with Moore, who had been vocal about his dissatisfaction with the audit.[6]

---

5. The other three terminated employees—Schuman, Brock, and Noe—filed a separate lawsuit against the County, which resulted in a jury verdict in favor of all three plaintiffs. See Schuman v. Lee Cty. Bd. of Cty. Comm'rs, No. 2:14–cv–121, 2016 WL 7232563 (M.D. Fla. June 14, 2016) (resolving various post-trial motions and ordering remittitur or a new trial on each plaintiff's damage award); see also Mem. Op. and Order, Schuman v. Lee Cty. Bd. of Cty. Comm'rs, No. 2:14-cv-121 (M.D. Fla. Feb. 4, 2016), ECF No.

79 (denying the County's motion for summary judgment and noting that the Schuman case is related to Wagner's case). To decide this case, however, we rely solely on the record in this case.

6. On November 22, 2013, Linda Doggett, the County Clerk of Courts, sent a letter to the County Board of Commissioners voicing her concerns about the termination of Wagner and her coworkers. Doggett noted that, if these employees were terminated because of

## G. Procedural History

On January 21, 2014, Wagner filed her initial complaint against the County and Salyer. On March 13, 2014, before any responsive pleading, Wagner filed an amended complaint, this time naming the County, Salyer, Moore, Christine Brady, and Berg as defendants.[7] The amended complaint asserted the following claims: deprivation of First Amendment rights under 42 U.S.C. § 1983 (Counts I, II, III, IV, and V); civil violations of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1964(c) (Counts VI, VII, and VIII); retaliation in violation of Florida's Public Whistleblowers Act (the "PWA"), Florida Statutes § 112.3187 et seq. (Count IX, asserted against only the County); and violation of the FLSA overtime provisions, 29 U.S.C. § 207 (Count X, asserted against only the County).

On May 12, 2014, defendants responded with a motion to dismiss. As to Wagner's First Amendment claims, the district court determined that these claims failed because the allegations were insufficient to support the finding that Wagner was speaking as a citizen when she complained about misconduct in the EDO. The district court accordingly dismissed Counts I, II, III, IV, and V of the amended complaint.[8]

With respect to Wagner's RICO claims, the district court determined that Wagner insufficiently pled that defendants' alleged racketeering activities proximately caused her injuries. The district court thus dismissed Counts VI, VII, and VIII of the amended complaint.

The district court denied the County's motion to dismiss as to Wagner's PWA claim (Count IX) and FLSA claim (Count X), both of which Wagner asserted against only the County. The litigation thus proceeded on Counts IX and X of the amended complaint with the County as the sole remaining defendant.

On August 14, 2014, the County filed its first motion for summary judgment as to Wagner's FLSA claim. The district court denied this motion, determining that there were genuine disputes of material fact regarding whether Wagner's work qualified as exempt from the FLSA's overtime requirements.

On August 21, 2015, Wagner filed a motion for summary judgment as to both her PWA claim and her FLSA claim. On September 4, 2015, the County filed its own for summary judgment as to both claims. On January 27, 2016, the district court denied Wagner's motion and granted the County's motion. On January 29, 2016, the district court entered judgment in favor of

their participation in the audit, then the terminations could be in violation of Florida law.

Doggett's letter was attached as an exhibit to Wagner's surreply in opposition to the County's motion for summary judgment. The County contends that the letter should not be considered on appeal because it is improper to introduce facts or arguments for the first time in a reply brief. See Herring v. Sec'y, Dep't of Corr., 397 F.3d 1338, 1342 (11th Cir. 2005). Before the district court ruled on the County's motion for summary judgment, the County moved to strike this letter from the record. The district court denied this motion to strike as moot in light of its ruling on the

cross-motions for summary judgment. We do not consider Doggett's letter in resolving this appeal.

7. Brady was employed in the County's Human Resources Department at the time of Wagner's termination. The claims at issue on appeal are only asserted against the County. The individual defendants did not file briefs on appeal.

8. On July 30, 2014, Wagner filed a motion seeking reconsideration of the district court's order to the extent that it dismissed Wagner's First Amendment claims. The district court denied this motion on August 21, 2014.

the County. On February 8, 2016, Wagner filed a Notice of Appeal.

On appeal, Wagner contends that the district court erred in granting summary judgment in favor of the County on her PWA claim (Count IX) and her FLSA claim (Count X). Wagner also argues that the district court improperly dismissed her First Amendment claim against the County (Count I). We discuss these claims in turn.[9]

## II. PWA CLAIM (COUNT IX)

In Count IX of the amended complaint, Wagner claims that the County fired her in retaliation for her participation in the audit, which constitutes a violation of the PWA.

### A. Elements of a PWA Claim

Under Florida's PWA, which prohibits retaliation against whistleblowers in public employment, a municipal government entity may not take an adverse personnel action against an employee in retaliation for the employee's disclosure of the municipal entity's misconduct. Fla. Stat. § 112.3187. We analyze PWA claims under the burden-shifting framework applicable to retaliation claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Sierminski v. Transouth Fin. Corp., 216 F.3d 945, 950 (11th Cir. 2000);

see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973). Thus, to prevail on a claim for retaliation under the PWA, the employee must show (1) that she engaged in statutorily protected activity, (2) that she suffered an adverse personnel action, and (3) that there is a causal connection between the protected activity and the adverse personnel action. Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998); see Rice–Lamar v. City of Fort Lauderdale, 853 So.2d 1125, 1132–33 (Fla. Dist. Ct. App. 2003) (citing Siermenski and holding that the Title VII retaliation framework applies in the context of a PWA claim).

Once the plaintiff establishes a prima facie case of retaliation under the PWA, the burden shifts to the employer to establish that there was a legitimate, non-retaliatory reason for the termination. Sierminski, 216 F.3d at 950. The burden then shifts back to the employee to show that the employer's legitimate, non-retaliatory reason is merely pretext for prohibited retaliation. Id.

The parties do not dispute that Wagner's termination constitutes an adverse personnel action. See Fla. Stat. § 112.3187(3)(c) (providing that "adverse personnel action" includes discharge). Below, we discuss whether the record evi-

---

**9.** We review de novo the district court's grant of summary judgment, considering the evidence and the inferences therefrom in the light most favorable to the nonmoving party. Ellis v. England, 432 F.3d 1321, 1325 (11th Cir. 2005). Summary judgment is appropriate where the evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine dispute where the evidence would allow a reasonable jury to find in favor of the nonmoving party. Ellis, 432 F.3d at 1325–26.

We also review de novo the district court's grant of a motion to dismiss under Rule

12(b)(6), accepting the factual allegations as true and construing them in the light most favorable to the plaintiff. Glover v. Liggett Grp., Inc., 459 F.3d 1304, 1308 (11th Cir. 2006). A formulaic recitation of the elements of a claim is insufficient to survive a motion to dismiss. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). The complaint survives a motion to dismiss only where the factual allegations "plausibly suggest an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. 662, 681, 129 S.Ct. 1937, 1951, 173 L.Ed.2d 868 (2009).

dence creates jury issues as to whether Wagner engaged in protected activity and whether a causal connection existed between Wagner's protected activity and her termination.

## B. Protected Activity

■ To establish that she engaged in protected activity under the PWA, Wagner must show that she disclosed (1) protected information (2) to a protected recipient (3) in a protected manner. See id. § 112.3187(5)-(7).

First, the information Wagner disclosed must fall within one of two protected categories:

(a) Any violation or suspected violation of any federal, state, or local law, rule, or regulation committed by an employee or agent of an agency or independent contractor which creates and presents a substantial and specific danger to the public's health, safety, or welfare.

(b) Any act or suspected act of gross mismanagement, malfeasance, misfeasance, gross waste of public funds, suspected or actual Medicaid fraud or abuse, or gross neglect of duty committed by an employee or agent of an agency or independent contractor.

Id. § 112.3187(5). The County does not dispute that the information Wagner disclosed falls within the scope of protected information under the PWA. Given that Wagner complained to Noe and the Internal Audit Department about the EDO paying for goods and services it did not receive, we conclude that the record supports the finding that the information Wagner disclosed concerned suspected "gross mismanagement, malfeasance, misfeasance, gross waste of public funds [or] gross neglect of duty committed by an employee." See id. Thus, a jury could find that Wagner disclosed protected information under the statute.

Second, the information must be disclosed to a person or entity falling within one of two protected categories:

[1] [A]ny agency or federal government entity having the authority to investigate, police, manage, or otherwise remedy the violation or act, including, but not limited to, the Office of the Chief Inspector General, an agency inspector general or the employee designated as agency inspector general under s. 112.3189(1) or inspectors general under s. 20.055, the Florida Commission on Human Relations, and the whistle-blower's hotline created under s. 112.3189 [or]

[2] [F]or disclosures concerning a local governmental entity, including any regional, county, or municipal entity, special district, community college district, or school district or any political subdivision of any of the foregoing, the information must be disclosed to a chief executive officer as defined in s. 447.203(9) or other appropriate local official.

Id. § 112.3187(6) (emphasis added). Florida courts construe the term "other appropriate local official" broadly to include a variety of governmental entities "empowered to investigate complaints and make reports or recommend corrective action." See Rustowicz v. N. Broward Hosp. Dist., 174 So.3d 414, 423–25 (Fla. Dist. Ct. App. 2015) (reviewing other Florida decisions and opinions issued by the Florida Attorney General). The state appellate court in Rustowicz concluded that an internal audit department at a municipal hospital constituted an "appropriate local official" within the meaning of the PWA. Id. at 416, 425.

Here, the record indicates that the Internal Audit Department is a government entity within the Lee County Clerk of Courts' office which is vested with at least some authority to investigate complaints

and make reports. We accordingly conclude that a jury could find that Wagner made disclosures to a protected recipient under the PWA.

Third, the disclosure must have been made in a protected manner. The PWA provides that it protects, inter alia, employees (1) "who disclose information on their own initiative in a written and signed complaint" or (2) "who are requested to participate in an investigation, hearing, or other inquiry conducted by any agency or federal government entity." Fla. Stat. § 112.3187(7). The County contends that the record does not support the findings that Wagner either made a voluntary disclosure in a written, signed complaint or that Wagner was requested to participate in the EDO audit. We disagree and conclude that the record evidence is at least sufficient to indicate that there is a genuine dispute of material fact regarding whether Wagner was requested to participate in the audit or whether Wagner made a voluntary disclosure in a written, signed complaint.

The record reflects that Noe was the EDO employee responsible for overseeing the audit and responding to the Internal Audit Department's requests throughout the investigation. In addition, Noe stated that the Internal Audit Department asked Noe to arrange for Wagner to meet with the auditors and that Noe directed Wagner to the auditors. Though Wagner did aver that she asked to participate in the audit anonymously, she did not aver that she volunteered to speak to the auditors in the first place. Wagner only alleged in the amended complaint that her participation was voluntary. From the evidence submitted in connection with the cross-motions for summary judgment, a reasonable jury could conclude that Wagner was requested to participate in the audit.

Further, the record includes a written, signed complaint and Noe averred that Wagner submitted a written complaint at some point during the investigation. While the complaint was not addressed to any certain recipient, it was apparently found in the audit file, thus creating jury issues as to what occurred.

We thus turn to the issue of whether there was a causal connection between this protected activity and Wagner's termination.

## C. Causal Connection

■  To establish a sufficient causal connection, Wagner must show that the protected activity and the negative employment action are related. See Chapter 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1260 (11th Cir. 2012) (quoting Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1278 (11th Cir. 2008)). To show that these two things are related, Wagner "must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action." Goldsmith, 513 F.3d at 1278 (quoting Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000)).

Close temporal proximity between the protected conduct and the termination may be sufficient to create a genuine dispute of material fact regarding causation. Brungart, 231 F.3d at 799. But where there is unrebutted evidence that the decision maker was unaware of the protected activity, temporal proximity alone is insufficient to create genuine dispute of material fact. Id.

Here, the record evidence is sufficient to create a genuine dispute of material fact regarding the causal connection between Wagner's participation in the audit and her termination. It is true that Salyer himself was not involved in the audit and that he stated that he was unaware of who participated in the audit. But this evidence is not

unrebutted. The audit report itself noted that the employee responsible for taking meeting minutes participated, and Noe stated that Wagner was the only employee responsible for taking such minutes. Though Salyer noted that this assumption was not based on verifiable fact, Salyer did state that he assumed that all EDO employees participated in the audit.

There is also evidence indicating that Moore was aware of Wagner's participation and that Moore and Salyer spoke about the audit when they met to discuss transitional matters before Salyer took over as the EDO's Interim Director. Salyer also heard Moore discuss the audit report and his negative impressions of it in the July 26, 2013 IDA meeting. Moore recommended terminating the employees who participated in the audit in his July 23, 2013 letter, just days after receiving the audit report. Salyer terminated those same employees shortly after taking over as Interim Director.

On this record, a jury could conclude that Wagner's participation in the audit and her termination were related. Because the evidence is sufficient to support the elements of Wagner's prima facie claim, we discuss the County's proffered legitimate, non-retaliatory reason for terminating Wagner.

## D. Legitimate, Non-Retaliatory Reasons

To carry its burden of showing that it terminated Wagner for a legitimate, non-retaliatory reason, the County must only articulate a reason that "might motivate" a reasonable employer to take the challenged employment action. Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000). The County proffers several such reasons.

The County produced evidence showing that County management tasked Salyer with reducing EDO expenditures and that Wagner's termination was in furtherance of that effort. The evidence of record also shows that the EDO was no longer using the real estate database on which Wagner worked and that the EDO's administrative work needs were not sufficiently high to justify the employment of four administrative employees.

These are non-retaliatory reasons that might have motivated a reasonable employer to terminate Wagner. We thus consider whether the record evidence indicates that these reasons were pretext for unlawful retaliation.

## E. Pretext

■ Because the evidence is sufficient to support the finding that the County terminated Wagner for a legitimate, nondiscriminatory reason, Wagner now bears the burden of showing that these reasons were merely pretextual. To carry this burden, Wagner must produce sufficient evidence from which a jury could conclude that the proffered reasons did not actually motivate her termination. See id. at 1024.

Wagner produced sufficient evidence to support the finding that the County did not terminate her because of a need to reduce its expenditures. Noe stated that the County in fact increased the EDO's budget during the year of Wagner's termination and that the County had approved this budgetary increase before Wagner's termination. Noe also stated that the EDO could have achieved its expenditure reduction goal by eliminating just one EDO employee. The record shows that Salyer instead terminated several employees, which supports the finding that the budget reduction was not the reason for Wagner's termination.

The evidence also supports the finding that Salyer was aware of the Wagner's

audit participation and that Salyer's predecessor was unhappy with the audit and its results. Before retiring, Moore recommended terminating the employees who participated in the audit and Salyer terminated those same employees. Salyer assumed that all EDO employees participated in the audit and he discussed the audit with Moore during their transitional meeting. Salyer was also present at the July 26, 2013 IDA meeting during which the audit was discussed. A reasonable jury could deduce, based on this evidence, that Wagner's audit participation was in fact the reason for her termination.

In sum, there are genuine disputes of material fact precluding summary judgment on Wagner's PWA claim.[10] We reverse the district court's grant of summary judgment to the County on Wagner's PWA claim (Count IX) and remand for further proceedings consistent with this opinion.

### III. FLSA CLAIM (COUNT X)

In Count X of the amended complaint, Wagner claims that the County violated the FLSA by failing to compensate her for time she worked in excess of forty hours per week.

Under the FLSA overtime provisions, where a covered employee works more than forty hours in one week, the employer must pay the employee overtime compensation for each excess hour at a rate equal to one and a half times the employee's regular rate of pay. 29 U.S.C. § 207(a)(1). To establish that she is entitled to overtime pay under this provision, Wagner must show (1) that she worked unpaid overtime and (2) that the County knew or should have known about this overtime work. Allen v. Bd. of Pub. Educ., 495 F.3d 1306, 1314–15 (11th Cir. 2007).[11]

Though the employee bears the initial burden of showing that she performed overtime work for which she was not compensated, her burden is relaxed where the employer failed to keep accurate time records. Lamonica v. Safe Hurricane Shutters, Inc., 711 F.3d 1299, 1315 (11th Cir. 2013). Under those circumstances, the employee carries her burden if she establishes that she performed work for which she was not compensated and if she comes forward with "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Id. (quoting Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515 (1946)). The burden then shifts to the employer to produce evidence to establish the exact number of hours the employee worked or to negate the reasonableness of the inference to be drawn from the employee's evidence. Id.

---

10. Because we conclude that there is a genuine dispute of material fact, we need not address Wagner's alternative argument that the district court erred by granting summary judgment on grounds not raised in the cross-motions for summary judgment. We note, however, that the County did argue in its summary judgment briefing that Wagner's activity was not protected both because Wagner did not submit a written, signed complaint to the auditors and because Wagner volunteered to participate.

11. The FLSA also provides that the overtime-wages mandate does not apply for an employee working in a bona fide administrative capacity. 29 U.S.C. § 213(a)(1). The employer bears the burden of proving that this exemption applies. Abel v. S. Shuttle Servs., Inc., 631 F.3d 1210, 1212 (11th Cir. 2011). The district court never reached or ruled on the exemption issue, and the County does not discuss exemption on appeal. Thus, we only address whether the evidence supports the finding that Wagner adequately made out the elements of her prima facie case. The exemption issue should be determined by the district court in the first instance.

■ Here, the evidence indicates that the County failed to keep an accurate record of Wagner's overtime work. Those records do not suggest that Wagner worked any overtime throughout her employment, but there is testimony tending to show that she did work overtime on an almost weekly basis. Even Salyer admitted to seeing Wagner stay past 5:00 pm on one occasion, but the County's official records indicate that Wagner never stayed past 5:00 pm.

Because the County records do not accurately reflect Wagner's working hours or the amount of overtime she worked, Wagner must only produce evidence showing the amount of overtime she worked as a matter of reasonable and just inference. Id. Wagner and Noe stated that Wagner worked at least two to three hours of overtime each week. Noe, Brock, and Schuman all confirmed that Wagner worked overtime on a regular basis and that the County did not keep track of overtime hours Wagner worked. Noe testified, for example, that Wagner often worked overtime completing meeting minutes from home. From this evidence, a jury could find that Wagner worked two to three hours of overtime most weeks during her employment and could arrive at a reasonable estimate of the total number of overtime hours for which Wagner is due compensation. See id.

Furthermore, the County failed to carry its burden of negating the reasonable inference to be drawn from Wagner's evidence. See id. Though Salyer did testify that Wagner did not work overtime on a regular basis, this evidence merely creates a genuine dispute of material fact regarding Wagner's overtime. The County records do not establish with any certainty whether Wagner worked overtime hours, and the testimony of Salyer is directly contradicted by the testimony of Wagner, Noe, Brock, and Schuman. If Wagner is not exempt,[12] there is at least a genuine dispute of material fact regarding whether Wagner is due overtime compensation under the FLSA, rendering summary judgment unavailable.

We accordingly reverse the judgment of the district court to the extent that it granted summary judgment to the County on Wagner's FLSA claim for failure to identify the precise number of overtime hours worked. We remand to the district court for further proceedings on this FLSA claim.

## IV. FIRST AMENDMENT CLAIM (COUNT I)

In Count I of the amended complaint, Wagner claims, pursuant to 42 U.S.C. § 1983, that the County unlawfully discharged her in retaliation for exercising her First Amendment free speech rights during the EDO audit. The district court dismissed this claim pursuant to Rule 12(b)(6).

■ After review, we cannot say that the district court erred in dismissing Wagner's First Amendment claim. Wagner's allegations only support the conclusion that Wagner's statements to the auditors were made "in accordance with or in furtherance of the ordinary responsibilities of her employment." See Alves v. Bd. of Regents of the Univ. Sys. of Ga., 804 F.3d 1149, 1162 (11th Cir. 2015). Because Wagner made these statements in accordance with her ordinary duties as an EDO employee, she was speaking in her capacity as an employee rather than in her capacity as a citizen and thus cannot prevail on a claim for First Amendment retaliation. See id. at 1160; see also Lane v. Franks, 573 U.S.

12. See note 11, supra.

——, ——, 134 S.Ct. 2369, 2379, 189 L.Ed.2d 312 (2014); Garcetti v. Ceballos, 547 U.S. 410, 418, 126 S.Ct. 1951, 1958, 164 L.Ed.2d 689 (2006). Accordingly, we affirm the district court's dismissal of Wagner's First Amendment retaliation claim.

## V.  CONCLUSION

Based on the foregoing, we affirm in part, reverse in part, and remand. As to the dismissal of Wagner's First Amendment retaliation claim (Count I), we affirm. With respect to the district court's order granting summary judgment in favor of the County on Wagner's PWA claim (Count IX) and FLSA claim (Count X), we reverse and remand for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**